Guy MASON, Petitioner,

v.

Charles R. BALKCOM, Warden, Respondent.

Civ. A. No. 79–127–MAC.

United States District Court,
M. D. Georgia,
Macon Division.

April 7, 1980.

James C. Bonner, Jr., University of Georgia School of Law, Legal Aid and Defender Soc., Prisoner Legal Counseling Project, Athens, Ga., for petitioner.

William B. Hill, Jr., Asst. Atty. Gen., State of Ga., Atlanta, Ga., for respondent.

## RULING ON PETITION FOR A WRIT OF HABEAS CORPUS

OWENS, District Judge.

The petitioner Guy Mason was convicted of murder and sentenced to death following a jury trial in the Superior Court for Baldwin County; on appeal his conviction and sentence was affirmed by the Georgia Su-

preme Court. *Mason v. State*, 236 Ga. 46, 222 S.E.2d 339 (1976). Petitioner next filed for a writ of habeas corpus in the Superior Court for Tattnall County. That habeas action was stayed while the petitioner pursued an extraordinary motion for a new trial in the Baldwin Superior Court; after an evidentiary hearing the extraordinary motion was denied by the trial judge. That decision was affirmed on appeal by the Georgia Supreme Court. *Mason v. State*, 239 Ga. 538, 238 S.E.2d 79 (1977). Subsequently, the Tattnall Superior Court held an evidentiary hearing on the habeas petition and denied that petition in a written opinion entered July 13, 1978. *Mason v. Hopper*, No. 76–218 (Sup.Ct. of Tattnall County, July 13, 1978). The Georgia Supreme Court denied a certificate of probable cause to appeal on October 3, 1978. Following the extensive state litigation described above, the petitioner filed for a writ of habeas corpus in this court pursuant to 28 U.S.C.A. § 2254. The petitioner has raised essentially six arguments of constitutional error, each of which has been presented to, considered and rejected by the state courts.

### I. Facts

The facts surrounding the killing which gave rise to this case are adequately summarized in the opinion of the Georgia Supreme Court entered upon the petitioner's initial appeal.

> On September 2, 1974, about 12:30 p. m., James Copeland drove Guy Mason (the appellant *) and Annie Ruth May (the victim) from their residence to her mother's home. The appellant had two pistols in his possession and gave one of them to the victim. Copeland next saw them at Oscar Davis' Place at approximately 2:30 p. m. that same day in Baldwin County, Georgia.
>
> The testimony concerning the events occurring in Oscar Davis' Place and in the street immediately preceding the death is to some degree in conflict. Copeland testified that the victim was arguing with several people, including the appellant.

There is some indication that appellant wanted to leave Oscar Davis' Place, but the victim was not ready. Subsequently, the victim told the appellant that she was ready to go. Appellant left the place first followed by the victim.

The victim's mother, Geneva Simmons, testified that she was present at Oscar Davis' Place but saw nothing of any consequence occur between appellant and the victim. Appellant testified that the victim had threatened to kill him while there. Mary Lee Curry also heard the victim threaten appellant.

J. L. Hitchcock was less than 100 feet from the appellant and the victim when he observed them walk out to the street. Mr. Hitchcock had never seen appellant or the victim before. He had an unobstructed view of the couple as they entered the street. Mr. Hitchcock saw that the victim's hands were down by her side and saw appellant pull a pistol from his right pocket and fire at the victim four times. They were facing each other as the victim moved backwards and the appellant advanced.

James Dennis testified that he heard a lady cursing and saw her reach under her sweater and pull out a pistol. At that time the man accompanying the lady shot her. Appellant testified that after they left Davis' Place he had walked ahead two or three steps, when he turned and saw the victim reach into her bosom and bring out a pistol so that the handle, not the barrel, was visible. He then "went to shooting just like that, how many times I shot I don't know." Appellant further testified that Linda Diane was also with them when he shot the victim. However, James Copeland testified that Linda Diane was with him in Oscar Davis' Place when the victim was shot.

When the shots were fired, Daisey Mae Powell (the victim's sister) ran into Oscar's Place and stated that appellant had just shot Annie Ruth May. James Copeland ran to the scene and removed the pistol (State's exhibit no. 4) from the

---

* "Appellant" was used in place of petitioner Guy Mason's name.

victim's bosom and placed it in his belt. James Dennis testified for the appellant that he saw some man remove the pistol from the victim's hand.

Upon arriving at the scene after a call at 3:54 p. m., Officer Thomas Aycock found the victim lying approximately 150 feet from Oscar Davis' Place. She had gunshot wounds in the temple area of her head and the upper part of her right leg.

Appellant surrendered to the sheriff about 5:00 p. m. on September 2, 1974. He entered the sheriff's office with a pistol in his hand and stated that he had just shot Annie Ruth May.

The pistol allegedly carried by the victim was recovered from a pool room where it had been pawned by James Copeland.

*Mason v. State, supra* 236 Ga. at 46–7, 222 S.E.2d 339, 340.

The facts concerning events at the petitioner's trial which gave rise to his complaints of constitutional error will be set out below in connection and as relevant to the discussion of each of the petitioner's arguments.

## II.   The Burden of Proof

The petitioner complains that certain portions of the trial judge's charge either impermissibly relieved the prosecution of its full burden of proof on an essential element of the crime of murder, namely intent, or impermissibly shifted the burden of proof on that element from the prosecution to the petitioner. Relevant portions of the charge are set out below:

Now, Ladies and Gentlemen, I will read you certain definitions under the Criminal Code of our State Code Section 26–1101 provides in part as follows: "A person commits murder when he unlawfully and with malice aforethought, either expressed or implied, causes the death of another human being. Expressed malice is that deliberate intention, unlawfully, to take away the life of a fellow creature which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circum-

stances of the killing show an abandoned and malignant heart.   (T. 147).

Now, Ladies and Gentlemen of the Jury, *malice is an essential ingredient in the offense of murder*, and it must exist before any homicide can be murder. But *malice in it's legal sense, is not necessarily ill will or hatred. It is the unlawful, deliberate intention to kill a human being without excuse, justification or mitigation.* It is not necessary, however, that this unlawful, deliberate intention should exist for any particular length of time before the killing. If it enters the mind of the slayer a moment before he fires the fatal shot that is sufficient.

*I charge you that the law presumes that a person intends to accomplish the natural and probable consequences of his conduct, and where a person uses a deadly weapon in the manner in which such weapons are ordinarily employed to produce death, thereby causing the death of a human being the law presumes an intention to kill.* (T. 147–48).

I further charge you that *if you believe beyond a reasonable doubt that the defendant* in this County, at any time prior to the filing of the indictment, with the weapon named in the indictment, and *with malice aforethought*, either expressed or implied, *did unlawfully kill the victim named in the indictment, and you believe the weapon used in the manner used, if one was used, was one likely to produce death, then you would be authorized and it would be your duty to convict the defendant of the offense of murder.* . . . (T. 148).

I charge you the pertinent portions of Code Section 26–901, the fact that a person's conduct is justified is a defense to prosecution for any crime based on that conduct . . . . .

A person is justified in threatening or using force against another, when, and to the extent that he reasonably believes that such threat or force is necessary to defend himself against such others imminent use of lawful force. (T. 149).

I charge you that if you believe his contentions in that he was justified under the principles of law as I have given you in charge, I charge if you believe the defendant's contentions to be the truth of the case, or if there is a reasonable doubt upon your mind, you should acquit the defendant. (T. 149).

. . . . .

I charge you that on the trial of a defendant charged with the crime of murder, *the burden is on the State to prove malice either expressed or implied beyond a reasonable doubt,* then there can be no verdict of guilty of murder as there can be no murder without malice.

I charge you that *malice is a state of mind and is a premeditated, deliberate intention and desire and designed (sic) to unlawfully kill another human being. In this connection I charge you that if you find the defendant acted in self-defense, then there would be no premeditation and deliberation and it would be your duty to find the defendant not guilty.* (T. 151).

I charge you as to the offense of murder or any lesser included offense, the State has the burden of proving the accused to be guilty beyond a reasonable doubt, the State has the necessity of establishing each and every essential part of the crime and each separate fact or link which goes to make the chain of circumstances and all of this must be proven to you beyond a reasonable doubt. (T. 151).

. . . . .

*In connection with the law on self-defense which I have given you, I charge you that in determining whether or not the Defendant acted in self-defense you're instructed that the burden is upon the State to prove to you beyond a reasonable doubt that the Defendant was not acting in self-defense. If you believe that the time and the place alledged [sic] in the indictment that the fatal bullet came from the gun held by the Defendant, but that you further believe that he was justified under one or more principles of law I have given you in charge or*

*that he did so in self-defense of his life or of his person, then it would be your duty to find the Defendant not guilty.* (T. 152–53).

I charge you that mere conjecture or mere suspicion of the Defendant's guilt is not sufficient to authorize his conviction under the law. He entered into the trial with the presumption of innocence in his favor and that presumption remains with him through the trial. Every person is presumed innocent until proven guilty. No person shall be convicted of a crime unless each element of such crime is proved beyond a reasonable doubt. (T. 153–54). (Emphasis added).

The specific portion of the above quoted charge attacked by the petitioner is that found on pages 147 and 148 of the transcript where the jury was charged that, "the law presumes that a person intends to accomplish the natural and probable consequences of his conduct, and where a person uses a deadly weapon in the manner in which such weapons are ordinarily employed to produce death, thereby causing the death of a human being the law presumes an intention to kill."

▪ The elements of the crime of murder in Georgia are "(1) unlawfully (2) causing the death of another human being (3) with malice aforethought." *Holloway v. McElroy,* 474 F.Supp. 1363, 1368 (M.D.Ga. 1979). As the trial judge correctly charged the jury in this case, malice is "the unlawful, deliberate intention to kill a human being without excuse, justification or mitigation." It is a "state of mind and is a premeditated, deliberate intention and desire and designed [sic] to unlawfully kill another human being." Thus, "intent to kill" is an integral part of an essential element of the crime of murder, namely malice aforethought. The prosecution had the burden to prove intent to kill beyond a reasonable doubt.

Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the ac-

cused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375 (1970)

In *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the Court, following *In re Winship* and its progeny, found constitutional error in a charge that "'the law presumes that a person intends the ordinary consequences of his voluntary acts." The defendant had been convicted of "deliberate homicide." The statute defined "deliberate homicide" as "purposely or knowingly" causing the death of another human being. The defendant admitted killing the victim but asserted that he did not do so "purposely or knowingly." These words were conceded to be equivalent to "intent" as used in the charge.

■ The Court held that the charge was error because

[A] reasonable jury could well have interpreted the presumption as "conclusive," that is, not technically as a presumption at all, but rather as an irrebuttable direction by the court to find intent once convinced of the facts triggering the presumption. Alternatively, the jury may have interpreted the instruction as a direction to find intent upon proof of the defendant's voluntary actions (and their "ordinary" consequences), unless *the defendant* proved the contrary by some quantum of proof which may well have been considerably greater than "some" evidence—thus effectively shifting the burden of persuasion on the element of intent. 442 U.S. at 517, 99 S.Ct. at 2456, 61 L.Ed.2d at 46–47 (Emphasis in the original).

The charge in the instant case is clearly within the proscription announced in *Sandstrom*. It is error for the very same reasons stated above. As in *Sandstrom*, the petitioner, in order to assert his defense, had to admit the facts upon which the presumption announced in the trial court's charge was activated. The jury could have adopted either of the impermissible conclusions of the law described by the Supreme Court in *Sandstrom*. As in the previous case of *Holloway v. McElroy, supra*, this court must find that the charge of the trial court impermissibly shifted the burden of proof on the issue of intent to kill to the defendant or at least removed from the prosecution the full burden resting upon it under *In re Winship*.

■ But the state argues in effect that the charge complained of was harmless error. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see United States v. Reeves*, 594 F.2d 536, 541 (6th Cir. 1979); *Gagne v. Meachum*, 602 F.2d 471 (1st Cir. 1979). Throughout the charge, the trial judge instructed the jury not that "intent to kill" equalled "malice" but that "malice" was the *unlawful, deliberate* intention to kill a human being without excuse, justification or mitigation." It was a "premeditated, *deliberate* intention and desire and designed [sic] to *unlawfully* kill." (Emphasis added.) The court charged several times that the prosecution had to prove malice beyond a reasonable doubt. In addition, and more importantly, the trial judge charged the jury that "the burden is upon the State to prove to you beyond a reasonable doubt that the Defendant *was not acting in self-defense.*" (Emphasis added).

The petitioner's only defense to the charges was self-defense. He thereby controverted only that the killing was unlawful and done with premeditation and deliberateness. The issue was not "intent to kill" per se but it was the lawfulness of the killing and of petitioner's intentions with respect thereto. Since the charge of the trial judge clearly imposed on the prosecution the burden of proving unlawfulness, premeditation and deliberateness beyond a reasonable doubt and these were the only disputed issues in the case, this court finds that the erroneous charge was harmless beyond a reasonable doubt and thus that the conviction and sentence should not be set aside on this ground.

### III. Jury Issues

#### A. Witherspoon.

■ The petitioner first argues that the exclusion by the trial court of two jurors

who were unalterably opposed to capital punishment produced an unrepresentative venire. This contention was rejected in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The petitioner has not alleged sufficient relevant facts to remove this case from the *Witherspoon* holding and to indicate any entitlement to relief on this ground. *See Easter v. Estelle*, 609 F.2d 756 (5th Cir. 1980).

The petitioner next contends that one of the two jurors was excused in violation of the standards announced in *Witherspoon* and its progeny. The colloquy between the district attorney and this juror is set out below:

Q. Are you conscientiously opposed to Capital Punishment? All right sir, and your name, sir?

A. Frank Brandon

. . . . .

Q. Mr. Brandon, I ask you a further question, have you already decided that should your fellow Jurors find the Defendant guilty of the Capital Offense charged that you will vote so as to avoid the imposition of the death penalty without regard to the facts and circumstances that might emerge during the course of the trial?

A. I'm opposed to capital punishment.

Q. That would be under any circumstances regardless of what the evidence was?

A. I reckon so.

■ Under *Witherspoon* and its progeny, a juror may not be excused for mere general scruples or opposition to the death penalty. The venireman who is excused must make it

unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.* 391 U.S. at 522 n. 21, 88 S.Ct. 1770,

1777 n. 21, 20 L.Ed.2d at 785 n. 21. (Emphasis in the original.)
*Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976). The excusal of even one juror on grounds broader than announced in *Witherspoon* is an error fatal to the validity of the death sentence though not of the conviction. *Davis v. Georgia, supra.*

■ The trial judge, cognizant of the *Witherspoon* issues, considering the questions asked by the district attorney, and observing and listening to the demeanor and tone of voice of the juror, found that Mr. Brandon would vote against the death penalty regardless of the facts and circumstances that may appear at trial and regardless of the law. This court upon an independent analysis and upon the state court's well founded finding of fact, agrees with the trial judge that Mr. Brandon was properly excused.

B. *Publicity.*

On the morning that the petitioner's jury was sent out to deliberate, the Macon Telegraph, a newspaper circulated in the county of the petitioner's trial, published an article about the petitioner's trial. In the last paragraph of this article the petitioner's prior 1956 conviction of murder was mentioned. One of the petitioner's counsel saw the article that morning before trial and brought it to co-counsel, Mr. Thompson's attention. Neither counsel knew whether any juror had read the article. Mr. Thompson testified that he had seen one juror, Mr. Phillips, enter the courthouse with some newspaper though he could not be certain which morning or which paper. Mr. Thompson brought the problem to the trial judge's attention who offered to take appropriate corrective action if desired by defense counsel. Neither counsel requested any corrective action. While at least one lawyer considered a voir dire of the jury, he was concerned about emphasizing the article thru voir dire.

At the hearing on the petitioner's extraordinary motion for a new trial, four jurors

testified. Three said that they had not read the article during the trial or afterwards and that neither the article nor petitioner's prior conviction was mentioned during the guilt/innocence phase deliberations. One juror, Mr. Harry Phillips, testified that he had read the article and knew about the prior conviction during the guilt/innocence deliberations but that that knowledge did not influence his deliberations in any way. His testimony is buttressed by the other juror's testimony that the inadmissible information was never mentioned by anyone during the deliberations.

■ In *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), the Supreme Court held that, in federal court, a juror's knowledge during the trial of a defendant's prior conviction was presumptively prejudicial. The Court explicitly stated that it was basing its decision on its supervisory powers over the federal courts. In *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the Supreme Court made clear that the rule announced in *Marshall* was not the constitutional standard upon which collateral attacks on state convictions would be measured. The Court stated that the Constitution requires impartial, indifferent jurors. All that is required is a juror who can lay aside his impression or opinion and render the verdict solely on the evidence. The only juror who knew about the petitioner's prior conviction did not consider that fact in his deliberations. The prior conviction was never mentioned to the other jurors. Therefore, the petitioner was not prejudiced by the publicity and cannot complain.

In addition, the petitioner's trial counsel knew of the problem during the trial and thought about the possibility of a voir dire of the jury. The trial judge was willing to take appropriate corrective measures including excusing any juror who had been exposed to the information and replacing that juror with an alternate. The defense counsel, concerned about such a voir dire doing more harm than good, did not ask for any corrective action. Thus the matter cannot now be raised in a habeas proceeding. *Rodriguez v. Estelle*, 536 F.2d 1096 (5th Cir. 1976).

*IV. Georgia Appellate Procedures*

■ The petitioner contends that the "appellate provisions and practices" in death cases deprived him of the effective assistance of counsel, due process of law, and equal protection of the law. The only factual and legal argument made to support this contention is the failure of the state to require the recording and transcription of counsel's closing arguments on the sentencing phase of the trial. The petitioner contends that this failure results in the appellate courts being unable to review all of the considerations which entered into the jury's finding for the death sentence.

In support of this argument, the petitioner relies principally upon *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). The holding of that case does not support the petitioner's argument. The defendant in *Gardner* had been sentenced to death by the trial judge in accordance with Florida procedure despite the jury's advisory recommendation of mercy. The trial judge relied in part upon a presentence report which was not disclosed to the defendant or to defense counsel. *Gardner* was a split decision, but a close reading of the various opinions shows that five justices agreed that imposing the death sentence based even in part upon information which was not disclosed to a defendant or his counsel so that it could be examined, supplemented or rebutted violated the Due Process Clause. A sixth justice, Justice White, agreed that using undisclosed information in such manner was error but he based his decision on the Eighth Amendment instead of due process. The plurality opinion, written by Justice Stevens and joined in by two other justices, did mention the need to include the presentence in the appellate record even if it were permissible to withhold it from the defense. This aside remark must be considered dictum, however.

This case is very unlike *Gardner* in any event. The arguments of the district attorney were heard by the petitioner and his

counsel. When his counsel felt that the prosecutor's arguments were out of bound, they objected and subsequently reconstructed the substance of the argument so that the Georgia Supreme Court could consider the correctness of the argument. The Georgia court found that the argument was proper and that ruling is not attacked here. *Mason v. State*, 236 Ga. 46, 48, 222 S.E.2d 339 (1976). No other prejudicial remarks are even suggested by the petitioner. The crux of the matter is that in Georgia closing arguments of counsel are never required to be recorded and/or transcribed except when requested by counsel. Georgia Code Ann. § 27–2401. Petitioner's counsel knew this and further must have observed that the arguments were not being transcribed. Under these circumstances, failure to record and transcribe the closing arguments are not constitutional error.

*V. The Voluntary Manslaughter Charge*

 The petitioner argues that the trial judge erred when he, in charging on voluntary manslaughter, stated that "if there should have been an interval between the assault or provocation given and the homicide sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge and shall be punished as murder." This charge is an almost exact quote from the statute and correctly states the Georgia law. In Georgia voluntary manslaughter is defined in terms of an objective or reasonable man standard. Though a defendant must have acted under sudden passion to claim the lesser penalty of manslaughter, he must in addition have acted based upon provocation that would excite a reasonable person. In conformity, the "cooling off" period after which the killing is murder must also be judged by a reasonable man standard, and that is the effect of the judge's charge. No constitutional error exists where the crime is properly described to the jury as the state legislature defined it.

This court finds no errors in the petitioner's trial, sentencing, or appeal which support setting aside either his conviction or his sentence. Accordingly, the petition for a writ of habeas corpus is hereby denied.

The stay of execution issued on June 5, 1979 shall remain in force and effect until such time as respondents move for dissolution on account of the petitioner's failure to appeal or affirmance after appeal.